UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENEANNE SHELLABARGER; and KENNETH POTTER,<br><br>Plaintiffs,<br><br>v.<br><br>DARREN DICHARRY, et al.,<br><br>Defendants. | No. 2:13-CV-00188-TLN-CMK<br><br>**ORDER DENYING DEFENDANT DICHARRY'S MOTION FOR SUMMARY JUDGMENT** |

The matter is before the Court on Defendant Darren Dicharry's ("Defendant") Motion for Summary Judgment.[1] (ECF No. 39.) On January 29, 2015, Plaintiffs Jeneanne Shellabarger and Kenneth Potter (collectively referred to as "Plaintiffs") filed an opposition (ECF No. 50), a response to Defendant's Statement of Undisputed Facts (ECF No. 51), and objections to Defendant's evidence submitted in support of Defendant's Motion for Summary Judgment. (ECF No. 52.) On February 4, 2015, Defendants filed a reply. (ECF No. 56.) The Court has carefully considered the arguments raised in the parties' briefing. For the reasons set forth below, Defendant's motion for Summary Judgment (ECF No. 39) is DENIED.

**I. Background**

This case concerns the execution of a search warrant on Plaintiffs' residence resulting in

---
[1] Although there are multiple defendants joined in this case, Defendant Dicharry brings the instant motion as an individual.

1

the death of Plaintiffs' dog.

### A.     Parties' Undisputed Facts

On March 24, 2011, nine officers including members of the Tehama Interagency Drug Enforcement Task Force ("TIDE") and the Glenn Interagency Narcotics Task Force ("GLINTF"), as well as officers from other law enforcement agencies in Tehama County, executed a search warrant on Plaintiffs' residence at 21179 Luther Road, Red Bluff, CA.  (Martinez Dep., ECF No. 39-8 at 7:19–25; Dicharry Decl., ECF 39-3 at ¶ 9.)  GLINTF was managed and supervised by the Task Force Commander, Curtis Parks, Special Agent Supervisor with the California Department of Justice ("DOJ"), Bureau of Narcotics Enforcement ("BNE").  (Dicharry Dep., ECF No. 39-7 at 11:3–4, 26:20–22; Dicharry Decl., ECF No. 39-3 at ¶ 1.)

Officer Raymond Martinez ("Martinez") was assigned team leader for the warrant on Plaintiffs' residence.  (Martinez Dep., ECF No. 39-8 at 92:20–93:9.)  Six officers were assigned by Martinez to the entry team with Defendant Dicharry first to enter, Martinez second, and other officers behind them.  (Dicharry Decl., ECF No. 39-3 at ¶ 9.)  Detectives Kevin Hale and Chad Dada were assigned to deploy a flash bang device in the back yard, and CHP Officer Neuman was assigned to lockdown an outbuilding and to cover the entry team in the front of the premises.  (Dicharry Decl., ECF No. 39-3 at ¶ 9.)  The detonation of the flash bang device caused excitement of the two dogs within Plaintiffs' residence, as observed through the glass windows at the front door.  (Dicharry Dep., ECF No. 39-7 at 45:19–46:3.)  A person was seen moving within the residence, causing Martinez and others to yell, "Compromised!"  (Martinez Dep., ECF No. 39-8 at 69:19–23.)  Defendant Dicharry opened the unlocked front door to Plaintiffs' residence.  As discussed below, the parties dispute whether Defendant gave a proper "knock and announce" warning prior to opening the door to Plaintiffs' residence.  When Defendant Dicharry opened the door, the entry team was confronted with one of Plaintiffs' dogs, Krizzy.  (Dicharry Dep., ECF No. 39-7 at 53:24–54:8; Potter Dep., ECF No. 54-5 at 12:15–16.)  Defendant Dicharry shot one round from his M4 rifle into the dog's head, killing it.  (Dicharry Dep., ECF No. 39-7 at 59:8–10.)  The dog came to rest by the front door at Defendant Dicharry's feet.  (Dicharry Dep., ECF No. 39-7 at 59:16–18.)  As discussed below, the rest of the details of this interaction are in

dispute.

**B.    Parties' Disputed Facts**

i. Planning and Briefing

Plaintiffs claim Officer Martinez knew he would be executing a search warrant for Plaintiffs' residence almost a week in advance, and he used this time to get additional information about Plaintiff Potter and research the location before the day of the execution of the warrant. (Martinez Dep., ECF No. 54-3 at 92:20–93:9, 39:6–7, 28:5–29:4.) Furthermore, Plaintiffs state that Defendant Dicharry knew he would be executing a search warrant on Plaintiffs' residence a "day or two" before actually executing the warrant. (Dicharry Dep., ECF No. 54-2 at 26:1–10.) However, Defendant claims that the raiding party had less than an hour to plan the execution of the warrant. (Def.'s Mem. Supp. Summ. J. 7, ECF No. 39-2 at 7; Dicharry Dep., ECF No. 39-7 at 26:23–27:17.) The warrant was issued on March 23, 2011, in the afternoon, and the briefings began at 0800 on March 24, 2011, with the executions of the warrants beginning at approximately 0900 the same day. (Def.'s Mem. Supp. Summ. J. 7, ECF No. 39-2 at 7.)

ii. Officer Safety and Non-Lethal Alternatives

Plaintiffs point out that in his deposition, Martinez stated that he and at least two other officers on the team had concerns about the tactical plan and wanted to execute the search warrant on Plaintiffs' residence differently. (Martinez Dep., ECF No. 39-8 at 35:23–37:11.) Specifically, they felt uncomfortable with the tactical plan because there might be dogs and armed occupants present, and the residence has a long driveway which could compromise a stealthy approach. (Martinez Dep., ECF No. 39-8 at 35:23–37:11.) The parties stipulate that prior to the execution of the warrant on Plaintiffs' residence, Martinez discussed with Acting Supervisor Eric Clay alternative plans for the execution of the warrant, such as a ruse to lure Plaintiffs away from the house, but none of the alternatives discussed were adopted. (Martinez Dep., ECF No. 39-8 at 32:2–23.) Plaintiffs claim that Clay required Martinez to execute the search warrant in a method Martinez believed was dangerous. (Pls' Opp'n, ECF No. 50 at 1.)

Defendant states that although the DOJ has successfully used fire extinguishers as non-lethal deterrent for aggressive dogs in the past, the use of a fire extinguisher was rejected in this

3

case for safety reasons.  (ECF No. 39-2 at 7; Martinez Dep., ECF No. 39-8 at 40:16–42:13.)  In particular, the necessity of keeping hands free for weapons would make the two-handed operation of the fire extinguisher impractical during the attempt to execute the warrant.  (Martinez Dep., ECF No. 39-8 at 37:16–38:24.)  Defendant Dicharry, Officer Martinez, and other agents on the raiding team carried other non-lethal devices such as a collapsible baton, pepper spray, and a taser to use as a deterrent for dogs.  (Martinez Depo., ECF No. 39-8 at 100:7–16; Dicharry Dep., ECF No. 39-7 at 42:25–43:4.)  However, they did not attempt to use these deterrents.

### iii. "Knock and Announce"

The parties dispute whether law enforcement knocked and announced their presence prior to entering Plaintiffs' residence.  Plaintiff Potter did not hear any law enforcement announcement or any knocking on the front door before it opened.  (Potter Dep. 16:12–23, 30:24–31:1, ECF No. 54-5.)  Plaintiff Shellabarger was not at home at the time of the raid.  Plaintiffs claim that Defendant Dicharry opened Plaintiffs' unlocked front door and entered the premises without first knocking and announcing his presence as a law enforcement officer.  (Martinez Dep. 69:2–18, 71:6–20, ECF No. 39-8.)  At best, Plaintiffs state that Defendant Dicharry announced his presence while simultaneously entering the residence, which also fails to comply with the "knock and announce" rule.  (Pls.' Opp'n Mot. Sum. J. 5, ECF No. 50.)  Plaintiffs point to the police report (Def.'s Req. Jud. Not., Ex. F, ECF No. 39-12), which chronologically describes Defendant opening the door, *then* announcing his presence.

Defendant states that he beat on the door with his closed fist and loudly announced "Sheriff's Office —Search Warrant" before he opened the unlocked door.  (Dicharry Dep. 50:20–51:20.)

### iv. Shooting

Plaintiffs maintain that their dog Krizzy was a hound dog and did not resemble a pit bull. (Potter Dep., ECF No. 54-5 at 12:10–20.)  Krizzy was approximately three years old when she was shot and killed by Defendant Dicharry.  (Shellabarger Dep., ECF No. 54-4 at 11:3–7.) Plaintiffs have never received any complaints about their dogs.  (Potter Dep., ECF No. 54-5 at 32:17–22.)  Notwithstanding the allegations regarding the day of the incident, Plaintiffs state their

4

dogs have never attacked any person or any dog. (Potter Dep., ECF No. 54-5 at 32:11–22.) Plaintiffs state that Plaintiff Potter did not see or hear any of the officers outside his residence prior to Defendant Dicharry opening the front door. (Potter Dep., ECF No. 54-5 at 16:12–23, 30:24–31:1.)

Defendant states that as he opened the front door, the large 60-pound pit bull, previously observed through the window, growled and lunged at the entry team. (Dicharry Decl., ECF No. 39-3 at ¶ 13.) Defendant claims he and the rest of the entry team did not have enough time to utilize any non-lethal deterrent items against the aggressive dog. (Dicharry Decl., ECF No. 39-3 at ¶ 13; Dicharry Dep., ECF No. 39-7 at 60:6–17.)

## II. **Standard of Law: Summary Judgment**

Summary judgment is appropriate when the moving party demonstrates no genuine dispute exists as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* at 324. Summary judgment should be entered against a party who does not make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322.

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish the existence of a genuine dispute as to any material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968). In

attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is instead required to proffer evidence of specific facts in the form of affidavits, or other admissible evidence, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *id.* at 251–52.

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank,* 391 U.S. at 289. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita,* 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.,* 677 F.2d 1301, 1305–06 (9th Cir. 1982). The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *Anderson,* 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd,* 810 F.2d 898 (9th Cir. 1987).

Finally, to demonstrate a genuine dispute of material fact that necessitates a trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 586–87.

### III. Analysis

Defendant asserts that summary judgment is warranted because: (1) he is owed qualified immunity; and (2) there was no Fourth Amendment violation. The Court addresses each of these arguments below.

#### A. Qualified Immunity Standard

"Qualified immunity balances . . . the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine of qualified immunity insulates government officials from civil damages in § 1983 litigation "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is an affirmative defense; the burden of pleading it rests with the defendant. *Crawford–El v. Britton*, 523 U.S. 574, 586–87 (1998) (citing *Gomez v. Toledo*, 446 U.S. 635, 639–41 (1980)). Furthermore, because qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Pearson*, 555 U.S. at 231 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) [hereinafter *Forsyth*]). Accordingly, the Supreme Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation. *Id.* at 233–34 ("Because qualified immunity protects government officials from suit as well as from liability, it is essential that qualified immunity claims be resolved at the earliest possible stage of litigation.") (citing *Forsyth*, 472 U.S. at 526).

In resolving the question of qualified immunity on a motion for summary judgment, the court must view the facts in the light most favorable to the plaintiff (*see Schwenk v. Hartford*, 204 F.3d 1187, 1198 (9th Cir. 2009), and can only grant the motion if defendants present evidence that would entitle them to a "directed verdict if the evidence went uncontroverted at trial." *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992).

The determination of qualified immunity requires a two-step test: (1) whether facts alleged, taken in the light most favorable to the injured party, show the defendants' conduct

7

violated a constitutional right; and (2) whether the right was clearly established. *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 915 (9th Cir .2012) (en banc). The first prong of the qualified immunity analysis is distinct from the inquiry on the merits of the constitutional violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Forsyth*, 472 U.S. at 527–28 (1985) ("A claim of immunity is conceptually distinct from the merits of the Plaintiff's claim that his rights have been violated.").

In deciding the second prong, the Court considers whether the contours of the right were sufficiently clear at the time that the action occurred so that a "reasonable official would understand that what he is doing violates that right." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987)). The Supreme Court has referred to decisions of the Court of Appeals when enquiring whether a right is clearly established. *See Forsyth*, 472 U.S. at 533; *Davis v. Scherer*, 468 U.S. 183, 191–192 (1984); *Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson*, 483 U.S. at 640). Thus, the Court makes a decision based on the reasonableness of an officer's understanding based on the applicable law. *See id.*; *Boyd*, 374 F.3d at 781. "However, a victim's constitutional rights may be clearly established in the absence of a case 'on all fours prohibiting [the] particular manifestation of unconstitutional conduct [at issue].'" *Id.* (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1286 (9th Cir. 2001)). Where an officer's conduct "is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established." *Id.* (quoting *Deorle*, 272 F.3d at 1286) (internal quotation marks omitted).

The Court decides in its discretion whether to address the first or second prong first. *See Pearson*, 555 U.S. at 237. However, if the Court initially addresses the first prong and finds that no constitutional right was violated under the alleged facts, the inquiry ends and defendants prevail. *Saucier*, 533 U.S. at 201.

8

1  **B.  Whether the Facts Alleged, Taken in the Light Most Favorable to the Injured
2  Party, Show the Defendants' Conduct Violated a Constitutional Right**

3  In *San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d
4  962 (2005) [hereinafter *Hells Angels*], the Ninth Circuit set forth the legal standard that applies
5  when a dog has been killed in the course of a search or seizure.  The Court found that the killing
6  of a dog is a destruction recognized as a seizure under the Fourth Amendment.  *Id.* at 975; *Fuller
7  v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), *as amended on denial of reh'g and reh'g en banc* (Nov.
8  23, 1994) *overruled on other grounds by Robinson v. Solano Cnty.*, 278 F.3d 1007 (9th Cir.
9  2002).  Reasonableness is the touchstone of any seizure under the Fourth Amendment.  To
10 comply with the Fourth Amendment, the seizure must have been reasonable under the
11 circumstances.  The court looks to the totality of the circumstances to determine whether the
12 destruction of property was reasonably necessary to effectuate the performance of a law
13 enforcement officer's duties.   *Hells Angels*, 420 F.3d at 975; *Deorle v. Rutherford*, 272 F.3d
14 1272, 1279 (9th Cir. 2001).

15 "A seizure becomes unlawful when it is more intrusive then necessary." *Hells Angels*,
16 420 F.3d at 975 (citing *Ganwich v. Knapp*, 319 F.3d 1115, 1122 (9th Cir. 2003)).  To determine
17 whether the shooting of the dogs was reasonable, the court balances "the nature and quality of the
18 intrusion on the individual's Fourth Amendment interest against the countervailing governmental
19 interest at stake." *Graham v. Conner*, 490 U.S. 386, 396 (1989).

20 The Court acknowledges that the government has a strong interest in protecting the public
21 from illegal drugs, in this case methamphetamine.  So, here the Court must weigh that interest
22 with the nature and quality of the intrusion.  At the outset, the Court notes that Defendant's
23 motion seems to assume that he correctly executed a knock and announce.  This fact is disputed.
24 In fact, Officer Martinez, the team leader for the warrant on Plaintiffs' residence, testified that he
25 remembered Defendant simultaneously announcing sheriff's office while opening the front door,
26 but could not remember whether he knocked prior to doing so:

27 / / /

28 / / /

| | | |
|---|---|---|
| Q. | | Do you independently recollect watching Officer Dicharry open the door to Mr. Potter's residence? |
| A. | | Do I remember that? |
| Q. | | Yeah. |
| A. | | Yes. |
| Q. | | Could you describe what you remember? |
| A. | | He -- he grabbed the handle. If it went inward. He announced, "Sheriff's office." And you got to realize, too, that I'm looking for other things. But that's what I saw. |
| Q. | | Okay. Prior to grabbing the handle and opening inward and announcing, "Sheriff's office," did you see him knock on the outside of the door? |
| A. | | No. But that's not to say he didn't. |

(Martinez Dep., ECF No. 39-8 at 68:22–69:10.)

In California a government official must still comply with the requirements of Penal Code § 1531 and § 844 when seeking to enter a residence to effect a search or arrest. Penal Code § 1531 states that an "officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance." The California Supreme Court has held that a yell that is simultaneous with the entry to a residence does not conform with the knock and announce requirement when the occupant was not given an opportunity to grant or refuse admittance. *People v. Benjamin*, 71 Cal. 2d 296, 298 (1969); *see also United States v. Granville*, 222 F.3d 1214, 1218 (9th Cir. 2000) (holding that the five seconds an officer waited before forcing his way into a home did not provide the tenant with a reasonable opportunity to ascertain who was at the door and to respond to the request for admittance). Thus, taking the facts in the light most favorable to Plaintiffs, this Court must assume that Defendant did not comply with the knock and announce requirement. Moreover, the Court finds that the alleged failure to knock and announce affects this Court's finding as to the reasonableness of Defendant's actions. For example, Defendant argues that shooting the dog was reasonable because Plaintiffs failed to restrain the dog. (ECF No. 39 at 8, 10.) However, if Defendant failed to knock and announce prior to

10

entering the residence, then Plaintiffs would not have had enough notice to restrain the dog.

In Defendant's reply, Defendant asserts that summary judgment is appropriate even if he did not comply with the knock and announce rule because the requirement is not "an inflexible rule requiring announcement under all circumstances. There were exceptions to the rule." (ECF No. 56 at 3.) Although the Court agrees with that statement of law, the Court finds that Defendant has not shown that one of these exceptions applied or that exigent circumstances were apparent at the time that Defendant executed the search. *See Richards v. Wisconsin*, 520 U.S. 385, 394 (1997) (holding for a "no-knock" entry, "the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effect of investigation of the crime by, for example, allowing the destruction of evidence."). Defendant fails to cite any specific undisputed material facts that suggest that Plaintiff Potter posed a threat to the officers. In fact, Defendant states in his motion that there was "minimal information about the possibility of weapons inside the house." (ECF No. 39 at 10.) Furthermore, the Ninth Circuit has repeatedly held that "generalized fears about how drug dealers usually act or the weapons that they usually keep is not enough to establish exigency." *United States v. Granville*, 222 F.3d 1214, 1219 (9th Cir. 2000) (citing *U.S. v. Zermeno*, 66 F.3d 1058, 1063 (9th Cir. 1995); *United States v. Becker*, 23 F.3d 1537, 1541 (9th Cir. 1994); *Richards*, 520 U.S. at 394 (rejecting a blanket exception to the knock and announce rule for searches in drug cases)). Therefore, for purposes of deciding this motion, the Court must ascertain whether Defendant's actions violated the Fourth Amendment, assuming that Defendant did not satisfy the knock and announce rule and without finding that exigent circumstances existed.

Defendant argues that killing the dog was reasonably necessary under the circumstances because the officers had less than an hour to prepare and the events unfolded so quickly there was no time to employ non-lethal deterrents. Both parties agree that the applicable case law is *Hells Angels*. However the parties disagree as to whether the facts of the instant matter usher this case under the purview of *Hells Angels* or distinguish it from that case's resolution.

In *Hells Angels*, the action arose out of the simultaneous execution of multiple search

warrants at members of the Hells Angels' residences and at the Hells Angels clubhouse. *Hells Angels*, 402 F.3d at 965. While executing one of the search warrants at the residence of plaintiffs Lori and Robert Vieira, the officers shot two of the Vieiras' dogs. *Id.* While searching plaintiff James Souza's property, the officers shot and killed one of Souza's dogs. *Id.* The plaintiffs alleged that the death of their dogs was an unlawful seizure in violation of the Fourth Amendment. *Id.* at 966. The defendants moved for summary judgment on the ground that they are entitled to qualified immunity. *Id.* The District Court denied defendants' motion. *Id.* On appeal, the Ninth Circuit held that the shooting of the dogs at the Vieira and Souza residences was an unreasonable seizure, and an unreasonable execution of the search warrants, in violation of the Fourth Amendment. *Id.* The court also held that exigent circumstances did not exist at either residence, as the San Jose Police Officers had a week to consider the options and tactics available for an encounter with the dogs and nonetheless, failed to develop a realistic plan for incapacitating the dogs other than shooting them. *Id.* Finally, the Ninth Circuit held that the unlawfulness of the officers' conduct would have been apparent to a reasonable officer at the time the officers planned for serving the search warrants. *Id.*

Defendant attempts to distinguish *Hells Angels* from the instant case, asserting that "in the instant matter while dogs were suspected to be present it was not known where they would be," and that "it was suspected that Plaintiff Potter would have weapons along with drugs and thereby utilizing his dogs and weapons to protect his stash." (ECF No. 39-2 at 7.) Defendant also contends that the officers herein did not have a week to plan, as they did in *Hells Angels*, but had less than an hour. "The search warrant was issued in the afternoon of March 23, 2011. The briefings began at 0800 on March 24, 2011 with the executions of the warrants beginning at approximately 0900 the same day." (ECF No. 39-2 at 7.) Defendant also asserts that the dogs running at him created a life or death situation that makes his actions reasonable.

The Court first addresses Defendant's argument that the instant matter is distinguishable because Defendant only had an hour to plan. The Court does not find this argument availing because although Defendant Dicharry may not have learned about the search until right before executing the search warrant, it is unclear from the provided facts how long the officers had in

12

1 fact been planning the search. The facts do indicate that the warrant was issued the day prior to
2 its execution. However, this in itself is not determinative of the time that went into planning. For
3 example, Agent Eric Clay had been investigating Plaintiff Potter prior to the warrant being issued.
4 Clay prepared the search warrant and provided his affidavit in support of the warrant application.
5 (Dicharry, Decl., ECF No. 39-3 at ¶ 5.) Martinez testified that he knew he would be tasked with
6 being team leader of executing the warrant one week prior to the incident. (Martinez Depo., ECF
7 No. 54-3 at 94:4–9.) Therefore, it is likely that plans or discussions on how to execute the
8 proposed search were conducted prior to the date that the warrant was executed. Thus, it is
9 inappropriate for this Court to hold that Defendant Dicharry's late notice of search makes the
10 search per se reasonable.

11    As to Defendant's assertion—that it was unclear whether dogs would be present—the
12 Court finds this claim to be disingenuous. Martinez testified that one of the red flags in executing
13 the warrant was the potential for dogs. (Martinez Depo., ECF No. 54-3 at 33:4–7.) Martinez also
14 testified that the issue of how to handle the dogs was discussed at the tactical briefing. (Martinez
15 Depo., ECF No. 54-3 at 38:12–24.) The failure to plan for dogs that were known to reside at the
16 property because "they could be at the vet or a kennel that day" is unreasonable. (*See* Martinez
17 Dep., ECF No. 39-8 at 38:9–15 (stating that he "did not know a dog would be present" because
18 they could have been in the yard, at the vet, or in a kennel.) The Court finds that these facts are
19 similar to those in *Hells Angels*. In that case, the officers knew of guard dogs at both search
20 locations and failed to plan for any non-lethal methods of incapacitation. *Hells Angels*, 402 F.3d
21 at 968–69. In finding that the seizure was unconstitutional, the Ninth Circuit explained:

22> While the governmental interest of safety might have provided a sound justification for the intrusion had the officers been surprised by the presence of the dogs, the same reasoning is less convincing given the undisputed fact that the officers knew about the dogs a week before they served the search warrants. The officers had substantial time to develop strategies for immobilizing the dogs. They knew or should reasonably have known that the Fourth Amendment requires officers to avoid intruding more than is necessary to enforce a search warrant. As the district court explained, the officers "created an entry plan designed to bring them into proximity of the dogs without providing themselves with any non-lethal means for controlling the dogs. The officers, in effect, left themselves without any option but to kill the dogs in the

13

1
2
 event they—quite predictably—attempted to guard the home from invasion."

3 *Id*. at 977 (internal citations omitted). This Court finds that the *Hells Angels* rationale applies to
4 the instant matter. Defendant has not shown that there was no opportunity to make a non-lethal
5 plan for dealing with the "possible" dogs. In fact, Defendants discussed the issue and failed to
6 come up with a reasonable plan or solution. This same rationale applies to Defendant's argument
7 that the dogs running at him created a life or death situation which made his actions reasonable.
8 Defendants created the reaction by setting off a flash bang device and failing to knock and
9 announce their presence so that the dogs could be restrained by their owners. Moreover, any
10 argument that the entry was conducted in this way in order to surprise Plaintiff Potter is undercut
11 by the fact that Defendants set off a flash bang device in the back yard. Defendant's decision to
12 set off the device compromised their ability to effectuate a quiet entry. *See id.* at 976.

13 Finally, Defendant argues throughout his briefing that he was just following orders.
14 However, established law holds that an officer is not given a blanket of immunity for following
15 orders—especially when the officers recognize that the proposed orders are flawed and dangerous
16 to the occupants. *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994). Defendant
17 has failed to provide this Court with any case law suggesting otherwise.

18 Viewing the facts in the light most favorable to Plaintiffs, the seizure was unreasonable.
19 Because the Court cannot determine that the seizure was reasonable and thus not violative of
20 Plaintiffs' Fourth Amendment rights, the Court turns to whether the law was clearly established.

21 **C.     Whether the Constitutional Right was Clearly Established**

22 In deciding the second prong, the Court considers whether the contours of the right were
23 sufficiently clear at the time that the action occurred so that a "reasonable official would
24 understand that what he is doing violates that right." *Mendoza*, 27 F.3d at 1361. At the outset,
25 the Court notes that Defendant does not assert that the law concerning this matter was unclear or
26 undefined. This Court looks to Supreme Court precedent as well as decisions of the Court of
27 Appeals when enquiring whether a right is clearly established. *See Forsyth*, 472 U.S. at 533. In
28 doing so, the Court finds that it is well defined within this circuit's case law that "'the killing of a

dog is a destruction recognized as a seizure under the Fourth Amendment' and can constitute a cognizable claim under § 1983." *Id.* at 975 (quoting *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), *overruled on other grounds*, *Robinson v. Solano County*, 278 F.3d 1007, 1013 (9th Cir. 2002) (citation omitted); *see also Miller v. Clark County*, 340 F.3d 959, 968 n. 13 (9th Cir. 2003) (recognizing that dogs are more than just a personal effect). Therefore, the Court finds that qualified immunity is inappropriate and denies Defendant's motion as to this claim.

### D. Defendant's Contention that No Fourth Amendment Violation Occurred

Defendant asserts that his actions were reasonable under the circumstances and that no Fourth Amendment Violation occurred. (ECF No. 39 at 5.) Although, a claim of immunity is conceptually distinct from the merits of a plaintiff's claim that his rights have been violated, there is no distinction in principle between the inquiry in such cases and the inquiry where the issue is qualified immunity. *See Forsyth*, 472 U.S. at 527–28 (1985). The Court has detailed the material issues of fact that prevent this Court from granting Defendant's qualified immunity claim and finds that those same facts prevent this Court from finding that no Fourth Amendment violation occurred, i.e. the disputed facts surrounding the following: the knock and announce; whether exigent circumstances existed; and Defendants' failure to plan for a non-lethal way of restraining Plaintiffs' dog Krizzy. Because these material issues of fact exist, this Court is unable to grant Defendant's motion for summary judgment.

### IV. Conclusion

For the foregoing reasons, the Court hereby DENIES Defendant Dicharry's Motion for Summary Judgment. (ECF No. 39.)

IT IS SO ORDERED.

Dated: September 11, 2015

Troy L. Nunley
United States District Judge