1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   JENEANE SHELLABARGER, et al.,          No.  2:13-cv-00188-TLN-CMK

12                  Plaintiffs,

13        v.                                **OPINION AFTER BENCH TRIAL
                                            CONTAINING FINDINGS OF FACT AND
14   KEVIN HALE, et al.,                    CONCLUSIONS OF LAW PURSUANT TO
                                            RULE 52(a)(1).**
15                  Defendants.

16

17        **I.     INTRODUCTION**

18              This Court presided over a three-day bench trial in this matter from November 13, 2017,

19   through November 15, 2017.  "In bench trials, a court must 'find the facts specially and state

20   separately its conclusions of law thereon.'"  *Simeonoff v. Hiner*, 249 F.3d 883, 891 (9th Cir.

21   2001) (quoting Fed. R. Civ. P. 52(a)).  "The findings and conclusions may be stated on the record

22   after the close of the evidence or may appear in an opinion or a memorandum of decision filed by

23   the court."  Fed. R. Civ. P. 52(a)(1).  "The findings should be explicit enough to give the

24   appellate court a clear understanding of the basis of the trial court's decision, and to enable it to

25   determine the ground on which the trial court reached its decision."  *Alpha Distrib. Co. of

26   California v. Jack Daniel Distillery*, 454 F.2d 442, 453 (9th Cir. 1972).  After reflection, the

27   Court believes that setting out its findings and conclusions in an opinion will best serve the

28   purposes of Rule 52(a), including facilitating appellate review.  To do this most effectively, the

1

Court will briefly explain the organization of this Opinion.

The instant action is comprised of three Fourth Amendment claims, each brought pursuant 42 U.S.C. § 1983. However, in essence, Plaintiffs Jeneane Shellabarger and Kenneth Potter's ("Plaintiffs") lawsuit has two parts. The first relates to the fatal shooting of their dog Krizzy by former Defendant Darrin Dicharry ("Dicharry") during the course of entering Plaintiffs' home on March 24, 2011, to execute a search warrant ("the Warrant").[1] The second relates to the non-return of three items of personal property not covered by the Warrant — a BMX bicycle, a paintball gun, and a Poulan chainsaw ("the Items") — that were seized from Plaintiffs' home. The reason for the three claims is that Plaintiffs have sued the Defendant City of Red Bluff for both the shooting death of Krizzy and the seizure of the Items, while Plaintiffs have only sued Defendants Raymond Martinez and Kevin Hale ("the Remaining Individual Defendants") for the death of the dog. Consequently, the Court will discuss the two parts of the case separately, cross-referencing between these parts in the few instances where this is necessary.

The Court will make two more preliminary points before proceeding. First, the parties waived closing arguments. They did so after being informed of this Court's standard practice of requiring parties to submit proposed findings of fact and conclusions of law after the close of evidence. In such circumstances, the proposed findings and conclusions serve the same function as closing arguments. Accordingly, the Court has drawn Plaintiffs' theories of liability primarily from Plaintiffs' proposed findings of fact and conclusions of law ("Plaintiffs' Proposed Findings," ECF No. 134). Where necessary and appropriate, the Court has considered Plaintiffs' trial brief (ECF No. 102), Plaintiffs' response to Defendants' trial brief (ECF No. 108), and Plaintiffs' oral opposition to Defendants' oral Rule 52(c) motion (ECF No. 124 at 26:5–44:8). In this opinion, the Court refers to those three sources, together with Plaintiffs' Proposed Findings, as "Plaintiffs' Submissions."

Second, Defendants' outstanding evidentiary objections are hereby denied without prejudice. Prior to resting their case, Plaintiffs' counsel indicated he would move to have certain

---

[1] The claim against Dicharry was dismissed with prejudice based on a stipulation for dismissal by Plaintiffs and Dicharry. (ECF No. 71.)

portions of depositions admitted ("the Excerpts").  Defense counsel indicated she anticipated

interposing evidentiary objections at that time.  Plaintiffs' motion was formally docketed on

November 29, 2017.  (*See* ECF No. 117.)   Defense counsel had already lodged her objections.

(*See* ECF No. 116.)  Plaintiffs filed a reply.[2]  (ECF No. 118.)  The parties filed their proposed

findings and conclusions on April 13, 2018.  (ECF Nos. 133 & 134.)  In preparing this Opinion, it

became apparent to the Court that its findings and conclusions would be precisely the same

irrespective of whether the Court considered the Excerpts.  Consequently, it is unnecessary to rule

on these objections to decide the case.  Rather, if this case is remanded for some reason,

Defendants may renew their objections, if applicable.  The Court's decision is consistent with the

Supreme Court's recognition that a federal district court has "the power inherent in every court to

control the disposition of the causes on its docket with economy of time and effort for itself, for

counsel, and for litigants."  *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  However, the

Court would note that objections that certain evidence is "cumulative" serves no practical purpose

in a bench trial — the Court is more than capable of determining when it has heard enough

evidence on an issue.  Accordingly, the Court would request Defendants refrain from renewing

such objections.

## II.    PART I: THE SHOOTING OF KRIZZY

The Court will set out the primary (or evidentiary) facts as the Court finds them by a

preponderance of the evidence.[3]  This will be followed by the Court's reasoning for reaching its

ultimate conclusions from these primary facts.  The Court will then set out its findings and

conclusions on the ultimate issues, including the ultimate facts, as necessary.

### A.  Primary Facts/Evidentiary Facts

#### i.      *Lead Up to the Execution of the Warrant*

1.  At all relevant times, Plaintiffs lived at 21179 Luther Road, Red Bluff, CA

("Plaintiffs' Residence").

---

[2]      The Excerpts are attached as an exhibit to the reply (ECF No. 118-1).

[3]      All of the Court's factual findings in this Opinion are made under a preponderance of the evidence standard.
The Court does not intend to repeat this each time it makes factual findings.

2. The Tehama Interagency Drug Enforcement Task Force ("T.I.D.E") worked with the Bureau of Narcotic Enforcement.

3. Agent Eric Clay, on March 24, 2011, and at all relevant times before that, worked for the Tehama County District Attorney's Office and was a member of T.I.D.E., where he was second in command.

4. Agent Clay obtained the Warrant to search Plaintiffs' Residence.

5. No evidence was introduced as to the date the Warrant was obtained.[4]

6. The Warrant was executed on March 24, 2011 ("the Warrant Execution").

7. The Warrant covered methamphetamine and drug paraphernalia.

8. The Warrant was obtained based, at least in part, on information from a confidential informant ("the CI").

9. The CI was a convicted felon.

10. The CI was receiving consideration on charges in exchange for providing the information offered in support of the Warrant.

11. The Warrant was executed by a team of officers ("the Team") led by Defendant Martinez.

12. The Team had the following nine members: Defendant Martinez, Defendant Hale, Dicharry, Josh Brazzi, Justin Hanes, Scott Teague, Chris Smith, Todd Newman, and Chad Dada.[5]

13. On March 24, 2011, and all relevant times before that, Defendant Martinez was a police officer with the City of Corning assigned to T.I.D.E.

14. On March 24, 2011, and all relevant times before that, Defendant Hale was a detective with the City of Red Bluff ("the City").

15. Defendant Hale was assigned to assist with the Warrant Execution but was not

---

[4]  Plaintiffs' Exhibit 14 — the Warrant "and attendant documents authorizing the search of Plaintiffs' residence" — was not admitted into evidence. (*See* ECF No. 114 at 2.)

[5]  The Court is not including the rank and agencies of the non-Defendants as it is immaterial to the Court's analysis and ultimate findings and conclusions, except to say that none of the non-Defendants worked for the City of Red Bluff.

1    formally a member of T.I.D.E.

2    16. Defendant Martinez learned of Plaintiff Potter and the location to be searched pursuant

3        to the Warrant approximately a week before March 24, 2011.

4    17. Defendant Martinez did not read the affidavit attached to the Warrant prior to the

5        Warrant Execution.

6    18. However, prior to the Warrant Execution, Defendant Martinez was aware that the

7        Warrant was for drugs and drug paraphernalia and that the Warrant was obtained

8        based on information from the CI.

9    19. Defendant Martinez had never met with the CI prior to the Warrant Execution.

10   20. The information Defendant Martinez had regarding Plaintiff Potter, which was relayed

11       to Defendant Martinez by Agent Clay, came from the CI.

12   21. Defendant Martinez was aware that the CI had indicated that firearms may be present

13       in the Residence prior to the Warrant Execution.

14   22. In anticipation for the Warrant Execution, Defendant Martinez ran Plaintiff Potter's

15       criminal history and reviewed a local law enforcement database particular to Tehama

16       County ("the Database").

17   23. Plaintiff Potter's criminal history indicated that Plaintiff Potter was a suspect in an

18       assault with a deadly weapon case ("the Deadly Weapon Case"), which the Red Bluff

19       Police Department was handling, along with what Defendant Martinez described as a

20       "12020 charge."

21   24. Defendant Martinez obtained and reviewed the police report ("the Police Report")

22       related to the Deadly Weapon Case.

23   25. The Police Report indicated the weapon allegedly used in the Deadly Weapon Case

24       was a vehicle.

25   26. Defendant Martinez did not know whether the "12020 charge" involved a firearm.[6]

26   27. The Database contained an alert that Plaintiff Potter was hostile toward law

27

28   [6]   At trial, Defendant Martinez acknowledged that this "12020 charge" appeared to have been dismissed. No evidence was introduced as to Defendant Martinez's knowledge of this prior to the Warrant Execution.

enforcement, at the time Defendant Martinez reviewed it, prior to the Warrant Execution.

28. Prior to the Warrant Execution, Defendant Martinez had information that children may be present at the Residence.

29. Prior to the Warrant Execution, Defendant Martinez had information that two dogs may be present at the Residence.

30. Defendant Martinez personally conducted reconnaissance of Plaintiffs' Residence on more than one occasion on different days in anticipation of the Warrant Execution.

31. One of the reasons Defendant Martinez did this was to observe the layout of Plaintiffs' Residence and obstacles and barriers that might be encountered during the Warrant Execution.

32. Defendant Martinez conducted a tactical briefing ("the Briefing") in advance of the Warrant Execution.

33. At the Briefing, Defendant Martinez did not read the Warrant verbatim although he relayed some of its contents to the persons present.

34. Defendant Martinez was in charge of developing the plan for entering Plaintiffs' Residence, rather than Agent Clay.

35. Defendant Martinez ultimately developed a plan for making entry into Plaintiffs' Residence in the following manner:

    a. The Team would arrive at Plaintiffs' Residence.

    b. Defendant Hale was to deploy a flash-bang to the rear of Plaintiffs' Residence to confuse and/or disorient persons in Plaintiffs' Residence.

    c. Meanwhile six officers would form into a "stack," i.e., lined up one after another ("the Stack").

        i. Dicharry would be the first in line in the Stack.

        ii. Defendant Martinez would be second in line in the Stack.

    d. The Stack would approach the front door of Plaintiffs' Residence contemporaneously or immediately after the deployment of the flash-bang.

e.  Upon arriving at the front door of Plaintiffs' Residence, the second person in line, Defendant Martinez, would perform a "knock and announce."

f.  The role of the first person in line was to identify threats and be the first person to make entry into the Plaintiffs' Residence.

36. The ultimate plan differed from the one Defendant Martinez originally developed; at the Briefing, Defendant Martinez had originally assigned an unidentified person behind him in the Stack to carry a fire extinguisher for the purpose of using it on dogs if the situation called for it.

a.  The Court will refer to this original plan to use a fire extinguisher as "the Original Dog Management Plan."

37. Defendant Martinez had been involved in earlier warrant executions where fire extinguishers had been used on dogs effectively because of the effect of the contents of the fire extinguisher on the dogs, which Defendant Martinez characterized as "hit[ting the dogs] pretty hard."

38. Under the Original Dog Management Plan, Defendant Martinez had not assigned himself to carry the fire extinguisher as he was tasked with knocking on the door.

39. Under the Original Dog Management Plan, Defendant Martinez did not assign Dicharry to carry the fire extinguisher because Defendant Martinez thought this would compromise officer safety.

40. Defendant Hale was present during some or all of the Briefing.

41. However, no evidence was introduced at trial that Defendant Hale knew dogs may be present prior to the Warrant Execution or that he was aware of the substance of the original plan to carry a fire extinguisher.

42. Defendant Martinez had misgivings about his plan due to what he described as "red flags."

43. The "red flags" included: the indication in the Database that Plaintiff Potter was hostile towards law enforcement, some of the information in Plaintiff Potter's criminal history, the possibility that Plaintiff Potter was involved in drug trafficking, the

possibility Plaintiff Potter may be armed, the possible presence of dogs, and the distance between the street and the front door of Plaintiffs' Residence, which Defendant Martinez described (without contradiction) as far away from the street.

44. Other members of the Team were uncomfortable with the plan due to the "red flags."

45. Due to these concerns Defendant Martinez left the Briefing and met with Agent Clay and possibly a second person ("the Meeting") in the carport area of the building where the Briefing took place.

46. During the Meeting, Defendant Martinez proposed alternatives such as waiting for persons in Plaintiffs' Residence to leave or luring persons in the Plaintiffs' Residence away using a ruse, but these alternatives were rejected by Agent Clay.

47. Defendant Martinez would have done things differently if it were his call rather than Agent Clay's.

48. Defendant Martinez would have preferred to have more persons in the Stack.

49. After the Meeting, Defendant Martinez was walking back to the Briefing when one or more members of the Team encountered him in the carport area ("the Encounter").

50. During the Encounter, the Team member assigned to carry the fire extinguisher under the Original Dog Management Plan indicated he was uncomfortable carrying the fire extinguisher due to information the Team had relating to the Warrant Execution.

51. Defendant Martinez always carried pepper spray, a collapsible baton, and a Taser on him.

52. During the Encounter, Defendant Martinez decided not to require this Team member to carry the fire extinguisher, indicated he carried less than lethal weapons which he would use if appropriate, and returned to the Briefing.

    a. The Court will refer to this modification to the overall plan as "the Modified Dog Management Plan."

53. Under the Modified Dog Management Plan, Defendant Martinez, as second in the Stack, would use less than lethal weapons on the dogs if, in his judgment, it was both appropriate and safe to do so.

54. However, Defendant Martinez planned to have a firearm in his hands at the outset of the Warrant Execution.

55. There is no evidence that Defendant Martinez announced the change in dog management plans upon returning to the Briefing.

56. There is no evidence that Defendant Hale was aware of the change in dog management plans.

*ii.      Execution of the Warrant — March 24, 2011*

57. On March 24, 2011, prior to the Warrant Execution, Plaintiff Potter was the only person in Plaintiffs' Residence.[7]

58. Plaintiff Potter was playing a video game in the front room of Plaintiffs' Residence immediately before the Warrant Execution commenced.

59. Defendant Hale deployed a flash-bang grenade at approximately 9:00 a.m., as provided for in the plan devised by Defendant Martinez.

60. The flash-bang grenade made a very loud sound.

61. The Stack began their approach roughly simultaneously with the deployment of the flash-bang grenade.

62. Upon hearing the explosion produced by the flash-bang grenade, Plaintiff Potter got up from playing the video game and maneuvered through the front room of Plaintiffs' Residence.

63. As the Stack was approaching, after the deployment of the flash-bang, Defendant Martinez saw a human form go past the glass in the front door of Plaintiffs' Residence.

64. Upon seeing this, Defendant Martinez said "compromised."

65. Defendant Martinez said this to alert the Stack that their presence was known to a person in Plaintiffs' Residence.

66. Defendant Martinez did this because he believed being detected by a person in Plaintiffs' Residence had the potential to compromise the safety of persons in the

---

[7] All paragraphs in this subsection refer to March 24, 2011.

1   Stack.

2   67. The Stack had not yet reached the front door of the Plaintiffs' Residence when

3        Defendant Martinez said "compromised."

4   68. The Stack continued the rest of the way to the front door of Plaintiffs' Residence,

5        which was unlocked.

6   69. Dicharry began to open the door without knocking while he simultaneously said

7        "Sheriff's Office."

8   70. Krizzy was approaching the front door of Plaintiffs' Residence as it was being opened.

9   71. Dicharry fired a single shot which fatally wounded Krizzy while simultaneously

10       pivoting backwards from the dog's approach.

11  72. Krizzy's momentum carried her body through the threshold of the front door where it

12       came to rest.

13  73. The period of time between the deployment of the flash-bang and the shooting of

14       Krizzy was approximately 20 seconds.

15  74. After Krizzy was shot, the Stack entered Plaintiffs' Residence.

16  75. Plaintiff Potter was unable to hear temporarily, possibly from the shot fired at Krizzy.

17  76. Plaintiff Potter recognized the Stack as police officers in tactical uniforms without

18       needing to be told.

19  77. Plaintiff Potter got down on the ground, despite being unable to hear, because these

20       officers' guns were pointed at him.

21  78. Plaintiff Potter was then handcuffed with his hands behind his back.

22  79. Defendant Hale did not see the Stack enter Plaintiffs' Residence.

23  80. Defendant Hale did not see Krizzy being shot.

24       B.   Analysis

25       The First and Third Causes of Action relate to the death of Krizzy.  With respect to the

26  First Cause of Action, Plaintiffs contend Defendants Martinez and Hale are liable for Krizzy's

27  death.  The Third Cause of Action is a *Monell* claim brought against the City, Defendant Hale's

28  employer.  The Court will begin its analysis with the First Cause of Action.

###### i.     *The First Cause of Action*

Plaintiffs contend that Defendants Martinez and Hale should be held liable for a Fourth Amendment violation that resulted in the death of Krizzy.  In their trial brief, Plaintiffs argued "Hale and/or Martinez may be liable for the violation of plaintiffs' constitutional rights, if they were an integral participant [sic] in the conduct giving rise to the violation." (ECF No. 102 at 13.)  Further, Plaintiffs argue that Defendant Martinez, as "team leader," was "a supervisor" and may be found liable if the Court determines as follows: Defendant Martinez was "personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation." (ECF No. 102 at 15.)

Whether one is an integral participant, a supervisor, or both, there must be an underlying Fourth Amendment violation that resulted in the death of Krizzy.  Clearly delineating what conduct a plaintiff is challenging as violative of the Fourth Amendment is of vital importance.  The same is true of identifying why a plaintiff contends this conduct violates the Fourth Amendment.  Unfortunately, to put it charitably, Plaintiffs' Submissions are somewhat imprecise on these points.  In an effort to clarify things, the Court will begin with an examination of the Supreme Court's recent decision in *County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017), which abrogated the Ninth Circuit's provocation rule.

###### a.     Examination of *Mendez*

*Mendez* arose out of a police shooting in a shack where one of the two occupants was holding a BB gun when the officers in question allegedly entered without announcing their presence.  In *Mendez*, the plaintiffs had three distinct Fourth Amendment claims:

> First, they claimed that the deputies executed an unreasonable search by entering the shack without a warrant (the "warrantless entry claim"); second, they asserted that the deputies performed an unreasonable search because they failed to announce their presence before entering the shack (the "knock-and-announce claim"); and third, they claimed that the deputies effected an unreasonable seizure by deploying excessive force in opening fire after entering the shack (the "excessive force claim").

*Id*. at 1545.

The case was tried to the district court in a bench trial.  In relevant part, the district court

found as follows: (i) "[u]nbeknownst to the officers, [the plaintiffs] were in the shack and were napping on a futon," (ii) one of the plaintiffs "kept a BB rifle in the shack for use on rats and other pests," (iii) "[t]he BB gun 'closely resembled a small caliber rifle,'" (iv) "when the deputies entered, [that plaintiff] was holding the BB gun, and it was 'pointing somewhat south towards'" one of the deputies, (v) the officers shot 15 rounds, and (vi) the plaintiffs "'were shot multiple times and suffered severe injuries,' and [one plaintiff's] right leg was later amputated below the knee." *Id.* at 1544–45 (original alterations omitted). Further, the district court found one of the deputies "liable on the warrantless entry claim, and the court also found both deputies liable on the knock-and-announce claim." *Id.* at 1545. However, the district court "awarded nominal damages for these violations because 'the act of pointing the BB gun' was a superseding cause 'as far as damage [from the shooting was] concerned.'" *Id.* With respect to the excessive force claim, the district court held that, under *Graham v. Connor*, 490 U.S. 386 (1989), "the deputies' use of force was reasonable 'given their belief that a man was holding a firearm rifle threatening their lives.'" *Id.* Nevertheless, the district court turned to the Ninth Circuit's provocation rule, "which holds that an officer's otherwise reasonable (and lawful) defensive use of force is unreasonable as a matter of law, if (1) the officer intentionally or recklessly provoked a violent response, and (2) that provocation is an independent constitutional violation." *Id.* at 1545 (internal quotation marks omitted).

The Supreme Court set out its Fourth Amendment precedent on excessive force claims as follows:

> The reasonableness of the use of force is evaluated under an "objective" inquiry that pays "careful attention to the facts and circumstances of each particular case." *Graham*, [490 U.S at 396]. And "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ibid.* "Excessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." *Saucier v. Katz*, [533 U.S. 194, 207] (2001). That inquiry is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim.

*Id.* at 1546–47.

12

The Supreme Court explained that the Ninth Circuit's provocation rule "mistakenly conflate[d] distinct Fourth Amendment claims." *Id*. at 1547. "Contrary to this approach, the objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional." *Id*. In *Mendez*, the district court had concluded "the use of force by the deputies was reasonable under *Graham*" but still allowed the recovery damages for that use of force "because the deputies committed a separate constitutional violation (the warrantless entry into the shack) that in some sense set the table for the use of force." *Id*. The Supreme Court explained that the district was wrong to do this. *Id*. However, the Supreme Court explained that if "a plaintiff has other Fourth Amendment claims, they should be analyzed separately." *Id*. Further, the Supreme Court explained that this did "not foreclose recovery for injuries proximately caused by" an earlier Fourth Amendment violation such as entering a dwelling in violation of the Fourth Amendment. *Id*. at 1548.

### b.   Intro to Plaintiffs' Krizzy-related Fourth Amendment theories

The Court returns to the fundamental point: in order for Plaintiffs' First Cause of Action to be successful, a Fourth Amendment violation must have caused Krizzy's death. Having carefully reviewed Plaintiffs' Submissions, it is apparent that Plaintiffs are pressing two (at least semi-discrete) legal theories of how the Fourth Amendment was violated.[8] The first theory is there was a knock-and-announce violation. The second theory turns on the adequacy of the Modified Dog Management Plan. The Court will discuss each in turn.

### c.   Whether there was a knock-and-announce violation

The Court will set out Plaintiffs' theory, Defendants' position, and relevant Fourth Amendment principles before turning to the Court's analysis of Plaintiffs' theory.

*///*

---

[8]    Candidly, the Court had to closely review each of Plaintiffs' Submissions more than once. Plaintiffs, of course, are free to advance more than one theory of liability (whether housed under the same or different causes of action). This is not uncommon. Nor is it uncommon that such theories have some overlap on the facts, the law, or both. But it does not ask too much from an attorney practicing in federal court to do the following: (i) coherently delineate with precision where one theory of liability starts and the next begins, (ii) with respect to each theory, explain what he believes his clients must show in order to prevail, and (iii) then, in an orderly way, explain why he thinks he has made these showings. Simply put, Plaintiff has not adequately done these things. This failure has made the Court's work to identify the precise contours of Plaintiffs' theories of liability extraordinarily — and needlessly — time consuming.

*1.    Plaintiffs' theory*

Plaintiffs' first theory of liability for their First Cause of Action can be succinctly summarized as follows: (i) members of the Team violated the Fourth Amendment by failing to knock and announce properly — i.e., members of the Team made a so-called "no knock entry" — without the presence of exigent circumstances, and (ii) this Fourth Amendment violation proximately caused Krizzy's death.

*2.    Defendants' position*

Defendants' proposed findings and conclusions acknowledge that Dicharry "opened the door of [Plaintiffs' Residence] without knocking and announcing." ("Defendants' Proposed Findings," ECF No. 133 at 7.) However, Defendants make three arguments why the Remaining Individual Defendants are not liable for this. First, they argue an exigency arose during the Warrant Execution prior to any member of the Team entering Plaintiffs' Residence and, therefore, a no-knock entry did not violate the Fourth Amendment. Second, assuming there was a knock-and-announce violation, the plan called for there to be a "knock and announce" before any member of the Team entered Plaintiffs' Residence, Dicharry chose to enter without doing this, and neither of the Remaining Individual Defendants were in a position to stop Dicharry. Third, the Remaining Individual Defendants are entitled to qualified immunity.[9]

*3.    Knock and announce: general principles*

In *Wilson v. Arkansas*, 514 U.S. 927 (1995), the Supreme Court "held that the Fourth Amendment incorporates the common law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry." *Richards v. Wisconsin*, 520 U.S. 385, 387 (1997). However, the Supreme Court subsequently observed that "*Wilson* and cases following it have noted the many situations in which it is not necessary to knock and announce." *Hudson v. Michigan*, 547 U.S. 586, 589

---

[9]      In exercise of this Court's discretion under *Pearson v. Callahan*, 555 U.S. 223 (2009), the Court chooses to analyze whether Plaintiffs have shown that the Remaining Individual Defendants violated their Fourth Amendment rights under this theory of liability. As Plaintiffs have failed to make this showing, the Court does not reach the second prong of qualified immunity analysis: whether "the unconstitutionality of the officers' conduct was clearly established." *Id.* at 227. Accordingly, it will serve no practical purpose to set out the parties' arguments as to this prong and, therefore, the Court declines to do so.

(2006). The Court will discuss these exceptions in a moment. First, it will be helpful to clarify one more point for those cases where an exception does not apply. In a non-exceptional case, police are expected to provide an occupant in the place to be searched the opportunity to voluntarily open the door after the police have knocked on the door and announced their identity and purpose. *Id*. For avoidance of doubt, in this opinion, the Court refers to knocking, announcing, and waiting a reasonable time before entering the place to be searched as having given "knock notice" or performed a "knock and announce." Further, the Court reiterates the Team had the Warrant, which covered Plaintiffs' Residence, and which has not been challenged in this case.

The Court will now discuss when officers are not required to perform a knock and announce before entering. Ultimately, in *Richards*, the Supreme Court held that "in each case, it is the duty of a court confronted with the question to determine whether the facts and circumstances of the particular entry justified dispensing with the knock-and-announce requirement." *Richards*, 520 U.S. at 394. The Supreme Court further held: "In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Id*. The Supreme Court explained that "[t]his standard — as opposed to a probable-cause requirement — strikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries." *Id*. The Supreme Court observed that "[t]his showing is not high, but the police should be required to make it whenever the reasonableness of a no-knock entry is challenged." *Id*. at 394–95.

With this in mind, the Court will make four additional points before continuing. First, the Fourth Amendment permits magistrates "to authorize a 'no-knock' entry" if a "warrant applicant gives reasonable grounds to expect futility or to suspect that one or another such exigency already exists or will arise instantly upon knocking." *United States v. Banks*, 540 U.S. 31, 36 (2003). Second, "even when executing a warrant silent about that, if circumstances support a reasonable

15

suspicion of exigency when the officers arrive at the door, they may go straight in." *Id*. at 36–37. That is, "[e]xigent circumstances [may] ar[i]se during staging for the entry" sufficient to permit a no-knock entry. *United States v. Peterson,* 353 F.3d 1045, 1049 (9th Cir. 2003). Third, Supreme Court precedent "require[s] only that police 'have a reasonable suspicion . . . under the particular circumstances' that one of [the three] grounds for failing to knock and announce [set out in *Richards*] exists, and [that precedent] acknowledge[s] that 'this showing is not high.'" *Hudson*, 547 U.S. at 589 (quoting *Richards*, 520 U.S. at 394) (original alterations omitted). Fourth, under the futility exception, officers are not required to knock and announce prior to entering a residence where there is reasonable suspicion that an occupant has ascertained that the police are outside that residence. *Peterson*, 353 F.3d at 1049.

### 4. *Reasoning*

The Court will discuss Plaintiffs' knock-and-announce theory for the Remaining Individual Defendants separately, starting with Defendant Hale.

#### a) <u>Defendant Hale</u>

As set out in the Court's finding of primary facts, the Court has found by a preponderance of the evidence that Dicharry began to open the door to Plaintiffs' Residence without knocking while simultaneously saying "Sheriff's Office." This is obviously not a knock-and-announce entry of the sort the Fourth Amendment ordinarily requires. However, for purposes of discussing Defendant Hale, there is no need to decide whether Dicharry was excused from making a no-knock entry due to one of the three grounds set out in *Richards*. Even assuming that Dicharry's entry violated the Fourth Amendment — and irrespective of whether Defendant Martinez might be held liable for a knock-and-announce violation, Defendant Hale may not be held liable for such a violation (under Plaintiffs' theory) unless he integrally participated in it.

Under Ninth Circuit precedent, "[i]ntegral participation . . . . require[s] some fundamental involvement in the conduct that allegedly caused the violation," although "each officer's actions [need not] themselves rise to the level of a constitutional violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007) (internal quotation marks and original alterations omitted). It is Plaintiffs' burden to prove Defendant Hale's integral participation in the no-knock

16

entry. *See Pavao v. Pagay*, 307 F.3d 915, 919 (9th Cir. 2002); *see also Dubner v. City & Cty. of San Francisco*, 266 F.3d 959, 965 (9th Cir. 2001) (explaining, in the context of a Fourth Amendment claim brought pursuant to § 1983, "[t]he plaintiff still has the ultimate burden of proof," even if in some circumstances a burden of producing evidence is imposed on the defendant).

The Court can only speculate whether Defendant Hale — *to this day* — has personal knowledge that any member of the Stack entered Plaintiffs' Residence without performing a satisfactory knock and announce. The Court has found that Defendant Hale was present at some or all of the Briefing; he was to deploy a flash-bang to the rear of Plaintiffs' Residence; the Stack entered Plaintiffs' Residence through the front door; and Defendant Hale did not see this entry. However, (i) Plaintiffs have introduced *no evidence* Defendant Hale agreed to participate in a plan that called for making a no-knock entry, and (ii) Plaintiffs have identified *no evidence* from which the Court can find that Defendant Hale had advance (or even contemporaneous) knowledge of Dicharry's method of entry, let alone that Defendant Hale had any opportunity to physically stop Dicharry or verbally object. For the avoidance of doubt, the Court finds it is clear that Plaintiffs have failed to show that Defendant Hale integrally participated in a knock-and-announce violation in connection with the entry into Plaintiffs' Residence.

b) Defendant Martinez

It is unclear from Plaintiffs' Proposed Findings whether they seek to impose liability on Defendant Martinez for entering Plaintiffs' Residence without knocking and announcing, for failing to stop Dicharry from doing so, or both. The Court does not understand Plaintiffs to argue that Defendant Martinez caused Dicharry to make a no-knock entry by saying "compromised" during the approach. However, even if Plaintiffs had made such an argument, no matter how you slice it, in order for Defendant Martinez to be held liable for a no-knock entry, he must not have had reasonable suspicion that any of the three *Richards* grounds were present. The Court finds that Defendant Martinez had reasonable suspicion that a knock-and-announce entry would be futile.

It will be helpful to review some specific testimony relating to the approximately twenty

second period between the deployment of the flash-bang and the shooting of Krizzy. Defendant Martinez testified as follows: "When we were walking up, this was one part I vividly remember. I remember seeing a body quickly go from the east to the west across an oval glass that's affixed to the door, that's part of the door. I remember seeing a body quickly go from one side to the other." (ECF No. 122 at 87:16–20.) This is consistent with the following testimony from Plaintiff Potter: after Plaintiff Potter heard a "loud boom," but before his "door swung open" and "police officers in tactical uniforms with guns drawn" entered his home, Plaintiff Potter "got up and was walking through the front room." (ECF No. 123 at 148:18–149:25.) After seeing a body through the oval glass, Defendant Martinez said "compromised" and explained that

> [b]y saying the word "compromised," you are alerting your team that you are no longer -- your presence is known pretty much. And at that point it's bad for officer safety because they know we're coming, and we don't know what they're -- their intentions are going to be or what they're going to be doing.

(ECF No. 122 at 88:18–25.) To avoid any doubt, the Court credits the testimony of Defendant Martinez and Plaintiff Potter set out above in this paragraph.

The Court is mindful of three other points. First, it is undisputed that Plaintiffs' Residence does have oval shaped glass in its front door. Second, Plaintiff Potter described the glass's appearance as "clouded, etched, I guess you would say." (ECF No. 123 at 163:2.) This is consistent with Defendant Martinez's own ambivalent response, when asked if "that oval is . . . . a frosted glass . . . . not a clear glass." (ECF No. 122 at 105:20–21.) Defendant Martinez's response was as follows: "I don't know if it's frosted, but I know it wasn't see-through, completely transparent, yeah." (ECF No. 122 at 105:22–23.) Third, from his vantage point, Defendant Martinez could not tell whether the person he saw was male or female and could not see that person's face.

The reality is this: if it were *absolutely certain* that an occupant of Plaintiffs' Residence saw the Stack approaching in tactical uniforms, and if it were also *absolutely certain* that that occupant recognized the Stack as law enforcement officers, it would be *absolutely certain* that one of the three exigent circumstances described in *Richards* would be present: futility. In explaining the futility standard, the Ninth Circuit put it this way: "Just as one cannot close a door

18

that is already closed, one cannot 'announce' a presence that is already known." *Peterson*, 353 F.3d at 1049. Announcement in such circumstances is "futile" within the meaning of *Richards* regardless of whether the person who has detected the officers is suspected of any wrongdoing. *See id*. at 1047–49 (finding futility where officers staging to execute a warrant for Mr. Peterson's home were recognized by Mr. Edwards, the boyfriend of Mr. Peterson's housemate).

However, as the Supreme Court has made repeatedly clear, the Fourth Amendment "require[s] *only* that police 'have a *reasonable suspicion* . . . under the particular circumstances' that *one of these grounds* for failing to knock and announce exists, and [the Supreme Court] ha[s] acknowledged that '[t]his showing is *not high*.'" *Hudson*, 547 U.S. at 590 (emphasis added) (quoting *Richards*, 520 U.S. at 394). The Court finds this standard is easily met here. Plaintiff Potter was able to recognize the Stack members entering his home as police officers by their appearance. Sure, it is *possible* that the person on the other side of the glass did not look through it, just as it is *possible* that the person did look through it but — for any number of reasons — did not see the Stack.[10] But, again, the Fourth Amendment does not require absolute certainty that the Stack has been detected. It requires Defendant Martinez to give "specific and articulable facts" that makes his suspicion that he has been detected reasonable. *Richards*, 520 U.S. at 394. He has, and the Court credits his testimony. A police officer might reasonably suspect that a person who has walked past a glass looked through it, saw people through that glass who only are a short distance away, and recognized those people — police officers in tactical gear — as police. Indeed, it is hard to think of a more eminently reasonable suspicion. Accordingly, Defendant Martinez is not liable for a knock-and-announce violation as he had reasonable suspicion that a knock-and-announce entry would be futile.

For the sake of completeness, the Court will address two additional points before proceeding. In Plaintiffs' Proposed Findings, Plaintiffs suggest this Court should find as follows: "Defendants created a situation where they alerted Plaintiff Potter that they were at the house, acknowledged their actions would cause the dogs to bark, but then claimed that they cannot

---

[10] These reasons could range from the poor eyesight to a characteristic of the glass such as the glass having a "clouded, etched" appearance as Plaintiff Potter described it.

comply with the knock and announce requirement because their presence was detected." (ECF No. 134 at 24.) First, the implication seems to be that, under Fourth Amendment precedent, Defendant Martinez is barred from arguing there is reasonable suspicion that there were exigent circumstances sufficient to excuse a no-knock entry if the exigent circumstances were somehow the result of bad tactics.[11] Second, this seems to presuppose the Court agrees with Plaintiffs' suggestion that it was irrational to use a flash-bang grenade as part of the broader plan developed by Defendant Martinez. The Court will address them in reverse order.

The broader plan called for the Stack to make it to the front door of Plaintiffs' Residence undetected. Plaintiffs liken the use of a flash-bang to accomplish this goal to another case where a police officer decided to shoot multiple shotgun blasts outside a residence to stop dogs from barking for fear the sounds of barking would alert the occupants of the residence to the search team's presence. The Court will discuss this case, *San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose* ("*Hells Angels*"), 402 F.3d 962 (2005), later in this Opinion. It is sufficient to say that, if a police officer is worried that loud *sounds* outside a home will give him away, substituting shotgun blasts for dog barking makes little sense. However, Plaintiffs' criticism is too facile.

Here, Defendant Martinez's plan called for reducing the chance the Stack would be *seen* while making their way from the street to the front door of Plaintiffs' Residence over what has been described (without contradiction) as a long drive way. Indeed, it seems to have taken the Stack approximately 20 seconds to do this. The plan called for *diverting the attention* of persons inside Plaintiffs' Residence *to the opposite side of Plaintiffs' Residence* (away from the Stack's approach) by making an unexpected, loud sound on that side of the home using a flash-bang grenade set off by an officer trained in its use. Having heard the explanation for why and how

---

[11]     Indeed, Plaintiffs suggest the Court has already resolved this question in the Court's Order denying Dicharry's motion for summary judgment (ECF No. 66). This is plainly not the case. As a general matter, when a federal district court concludes that a movant has not met its burden to show there is no triable issue on a particular issue, the district court is not prejudging whether the non-movant will prevail at trial on that issue. Nothing in the Court's Order is to the contrary. (*See, e.g.*, ECF No. 66 at 11 (making explicitly clear that "for purposes of deciding this motion, the Court must ascertain whether Defendant's actions violated the Fourth Amendment, *assuming* that Defendant did not satisfy the knock-and-announce rule and without finding that exigent circumstances existed") (emphasis added).

this was to be done, the Court simply does not agree that this was an irrational, unreasonable, or dangerous thing to do.[12]  Even so, as Defendants correctly observed, Plaintiffs "cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided."  *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1777 (2015) (internal quotation marks omitted).  Further, the Supreme Court has made clear that police officers are permitted to respond to exigencies without violating the Fourth Amendment even if those exigencies can somehow be traced to the officers' conduct, so long as "the police did not create the exigency by *engaging or threatening to engage in conduct that violates the Fourth Amendment*."  *Kentucky v. King*, 563 U.S. 452, 462 (2011) (emphasis added).  For the reasons set forth above, the Court concludes the use of the flash-bang was not a Fourth Amendment violation.  Obviously, the use of the flash-bang was not a threat to engage in conduct that violates the Fourth Amendment.

d.  <u>Whether there was a sufficient dog management plan?</u>

The parties disagree whether the dog management plan ultimately devised by Defendant Martinez is sufficient under *Hells Angels*.  The Court agrees with Defendants that it is sufficient.  While there may be other ways to find that neither of the Remaining Individual Defendants may be held liable under Plaintiffs' second theory of liability for their First Cause of Action, the Court concludes this is the most efficient way to address this theory of liability.  To understand why this is so, the Court will discuss a few preliminary points.  After this discussion, the Court will examine *Hells Angels*.  The Court will then explain its conclusion regarding the adequacy of Defendant Martinez's plan.

*1.  Preliminary points*

The Court will make four preliminary points before examining the Ninth Circuit's opinion in *Hells Angels*.  First, Plaintiffs' Proposed Findings contains the following recommended

---

[12]    The Court is aware that a flash-bang grenade explodes and can present a danger if thrown into a dwelling where there is reason to believe people are present.  *Cf. Boyd v. Benton Cty.*, 374 F.3d 773, 779–80 (9th Cir. 2004).  Here, no evidence or argument has been offered that suggests that the explosion of the flash-bang in the circumstances placed any person in Plaintiffs' Residence in physical jeopardy.  The flash-bang simply functioned as a noise-making device.  There is no suggestion in Supreme Court or Ninth Circuit precedent that producing a momentary, loud noise outside of a dwelling as a distraction is unreasonable at all, let alone in anything approaching these circumstances.

21

language:

> This Court further holds that it is unnecessary to make any further findings regarding whether a dog management plan was properly devised by Defendants, since any such plan would have been superfluous given Defendants' unconstitutional entry which directly led to the shooting of Plaintiffs' dog. However, having heard all of the evidence, and reviewed the law, this Court will separately analyze Defendants' plan for execution [sic] the search warrant and managing the dogs known to be present; as discussed below, Defendants [sic] conduct in devising a plan to manage the dogs was unreasonable and does not meet the law established in [*Hells Angels*].

(ECF No. 134 at 26 (original alterations omitted).) This suggests Plaintiffs believe that Krizzy would have died irrespective of whether Defendant Martinez developed a dog management plan that (in their view) satisfied the lessons of *Hells Angels*. *If* this is what Plaintiffs are driving at, it is hard to see how Krizzy's death could be caused by a Fourth Amendment violation arising from the supposed failure to develop a *Hell Angels*-compliant plan, as *this conduct* would not be the cause of the complained-about seizure.[13]

Second, "[i]n a civil case under 42 U.S.C. § 1983 . . . the plaintiff carries the ultimate burden of establishing each element of his or her claim[.]". *See Pavao*, 307 F.3d at 919. It seems Plaintiffs did not anticipate the Court might conclude — as it has — a no-knock entry took place but, nevertheless, conclude that neither of the Remaining Individual Defendants could be held liable for this. Unfortunately, this leaves the Court to wonder whether Plaintiffs believe their own dog management theory of liability is viable at this point. However, "[a] federal district court judge 'has a limited and neutral role in the adversarial process, and must be wary of becoming advocates who comb the record of previously available evidence and make a party's case for it.'" *Breining v. Ocwen Loan Servicing, LLC*, No. 2:13-cv-02441-TLN-DB, 2018 WL 1535532, at *8 (E.D. Cal. Mar. 29, 2018) (original alterations omitted) (quoting *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998)). "Instead, the burden is on the parties, through their attorneys, to advance their case by developing legal arguments and martialing evidence at the

---

[13] "The Fourth Amendment prohibits 'unreasonable searches and seizures.'" *Mendez*, 137 S. Ct. at 1546. It does not prohibit plans — even very unreasonable ones — that by happenstance do not cause a search or seizure. Suppose the plan in this case was to shoot Plaintiffs' dogs regardless of the circumstances, but the dogs happened not to be present at Plaintiffs' Residence during the Warrant Execution. Obviously, there would be no Fourth Amendment violation from this patently unreasonable plan.

appropriate times." *Id.* (citing *Greenlaw v. United States*, 554 U.S. 237, 243–44 (2008)); *see Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005) ("Perhaps the broadest and most accepted idea is that *the person who seeks court action should justify the request*, which means that the plaintiffs bear the burdens on the elements in their claims.") (emphasis added) (quoting C. Mueller & L. Kirkpatrick, Evidence § 3.1, p. 104 (3d ed. 2003)). From these principles, the Court holds that a plaintiff in a civil bench trial in federal district court cannot succeed on a § 1983 claim where that plaintiff has failed to coherently articulate a theory of liability that would require judgment be entered in his favor on the facts as the district court finds them. Accordingly, the Court independently concludes that Plaintiffs have failed to meet this burden with respect to this theory of liability, irrespective of whether Defendant Martinez's plan satisfies *Hells Angels*.

Third, for the sake of completeness and finality, the Court sees no point in being coy about its conclusion that Defendant Martinez's plan satisfied *Hells Angels*. Here, however, the Court emphasizes that it is making a finding with respect to the Modified Dog Management Plan. Plaintiffs have not argued that the Original Dog Management Plan runs afoul of *Hells Angels*. Accordingly, following the principles set out in the preceding paragraph, Plaintiffs have conceded the point for purposes of this trial.

Fourth, resolving the *Hells Angels* question with respect to the Modified Dog Management Plan has the added benefit of efficiently resolving Plaintiffs' second theory of liability.[14] At bottom, Plaintiffs seek to impose liability on Defendant Hale for supposedly failing to object to Defendant Martinez's dog management plan, despite knowing dogs might be present. The most fundamental problem with Plaintiffs' theory is that it never specifies which plan they are referencing. There are three options. The first option is that Defendant Martinez never formulated the Original Dog Management Plan in the first place, i.e., the plan was in effect the

///

///

///

---

[14] Plaintiffs' theory as to Defendant Hale is incoherent in multiple ways that, unfortunately, react synergistically. The Court declines to engage in the fool's errand of expounding some grand unified explanation as to why Plaintiffs' theory is this way.

23

complete absence of a plan to manage the dogs.[15] The Court has expressly found by a preponderance of the evidence that Defendant Martinez discussed the Original Dog Management Plan at the Briefing.[16] The second option is the Original Dog Management Plan. Of course, for the reasons already discussed, this also fails as Plaintiffs have not argued that this plan was inadequate under *Hells Angels*. This leaves only one possibility — that Plaintiffs are complaining about Defendant Hale's failure to object to the Modified Dog Management Plan. If this plan satisfied *Hells Angels*, Defendant Hale cannot be liable for failing to object to it. With this in mind, the Court will proceed.

### 2. *Hells Angels*

The *Hells Angels* litigation arose "out of the simultaneous execution of search warrants at the residences of members of the Hells Angels, and at the Hells Angels clubhouse on January 21, 1998." *Hell Angels*, 402 F.3d at 965. As relevant here, the plaintiffs brought Fourth Amendment claims pursuant to 42 U.S.C. § 1983 in connection with the killing of three dogs at two of the searched residences — the Vieira residence and the Souza residence. *Id*. The case came to the Ninth Circuit on an appeal from an order of the district court denying their motions for qualified immunity. *Id*. at 966. Viewing the facts through the familiar summary judgment lens, the Ninth Circuit affirmed the district court concluding that the relevant officers were not entitled to qualified immunity in connection with the shooting of the dogs. *See id*.

---

[15] This would require the Court to disbelieve Defendant Martinez's testimony on this point. The Court found Defendant Martinez's testimony credible and that it preponderates over the evidence supporting the theory Defendant Martinez did not discuss this plan at the Briefing. The only evidence on the other side of the ledger is as follows: Defendant Hale was asked about a 2013 briefing ("the 2013 Briefing") regarding Plaintiffs' Residence unrelated to this action during his August 25, 2014, deposition. Defendant's memory of that discussion was "[t]hat [Plaintiff Potter] had dogs in the house and that we needed to try and take some sort of measures to protect the animals." (ECF No. 118-1 at 18:16–17.) However, Defendant Hale answered "[n]o" when asked if he could recall having that same discussion in 2011 during the Briefing relating to the Warrant Execution in this case. (ECF No. 118-1 at 18:21.) The Court assigns relatively little weight to Defendant Hale's failure to recall a particular discussion in a particular briefing on a topic that was not germane to his assigned role in executing a warrant at a deposition nearly three-and-a-half years after the fact, particularly where Defendant Hale testified that he has been involved in the execution of approximately 80 to 100 warrants. (*See* ECF No. 123 at 17:20–21.)

[16] It is worth noting that the only evidence introduced at trial (including the excerpts of depositions submitted by Plaintiffs) that Defendant Hale was aware of dogs at Plaintiffs' Residence is Defendant Martinez's testimony that he discussed the Original Dog Management Plan at the Briefing and that Defendant Hale was present at the Briefing. If the Court had found this discussion had not taken place, Defendant Hale could not be held liable *under Plaintiffs' own theory*.

Ultimately, the Ninth Circuit's teachings as to dog management plans can be succinctly set out as follows: The officers in question "created an entry plan designed to bring them into proximity of the dogs without providing themselves with any non-lethal means for controlling the dogs." *Id*. at 977 (internal quotation marks omitted). "The officers, in effect, left themselves without any option but to kill the dogs in the event they — quite predictably — attempted to guard the home from invasion." *Id*. (internal quotation marks omitted). However, "[a] reasonable officer should have known that to create a plan to enter the perimeter of a person's property, knowing all the while about the presence of dogs on the property, without considering a method for subduing the dogs besides killing them, would violate the Fourth Amendment." *Id*. at 978. Consequently, "the failure to develop any realistic non-lethal plan for dealing with the dogs is simply not the type of reasonable mistake in judgment to which a court should give deference in determining whether the officers are entitled to qualified immunity." *Id*.

Plaintiffs suggest that "[t]he present case is eerily similar to *Hells Angels* in that in both cases the officers knew of dogs at both search locations and failed to plan for any non-lethal methods of incapacitation." (ECF No. 134 at 36:18–19.) Having carefully reviewed *Hells Angels* and the evidence submitted at trial in this case, the Court finds this suggestion to be a gross mischaracterization. Rather, in *Hells Angels*, as in the instant case, at least some members of the search teams knew they were likely to encounter dogs during the course of executing a warrant, a plan of some sort was devised with respect to handling the dogs, and, ultimately, dogs were shot. The similarities end there. It is unnecessary to recite the underlying facts of *Hells Angels* here to understand the takeaway from that case as it relates to dog management plans. In short, as relevant here, *Hells Angels* stands for the proposition that where officers have sufficient advance notice to expect dogs may be present during the execution of a search warrant, non-lethal means for controlling the dogs should not only be considered, they should be available to an officer tasked with controlling them, who should have a plan where it is realistic a non-lethal option might be effectively employed.

///

///

*3. Reasoning*

The Court concludes that Defendant Martinez's Modified Dog Management Plan is *Hells Angels*-compliant. Specifically, the Court finds (i) Defendant Martinez considered non-lethal means for controlling the dogs at Plaintiffs' Residence, (ii) Defendant Martinez had non-lethal means available to him, and (iii) the Modified Dog Management Plan was a plan under which it was realistic that Defendant Martinez might have employed one of these non-lethal options if appropriate to do so. The Court will address these in order, examining the first two together.

Defendant Martinez originally tasked a Stack member behind him with carrying a fire extinguisher. Ultimately, he changed his mind when approached by that Stack member (and possibly another person). On direct examination Defendant Martinez was specifically asked: "Since you declined the fire extinguisher, what was your specific plan in how to manage the dogs when you executed the search warrant?" (ECF No. 122 at 62:11–13.) He responded: "Since I was second in the stack, if appropriate and safe, I would have deployed some type of less-than-lethal option." (ECF No. 122 at 62:14–16.) Likewise, on cross-examination Defendant Martinez was specifically asked: "When you were told that the officers didn't want -- did not want to carry [the fire extinguisher], did you consider other less than lethal options to use if you were to encounter the dogs?" (ECF No. 122 at 85:24–86:1.) Defendant Martinez answered in the affirmative and stated: "I carry pepper spray, a collapsible baton, and a Taser on my person, and I would have used one of those if appropriate and timely." (ECF No. 122 at 86:2, 4–6.) The Court credits Defendant Martinez's testimony set out in this paragraph. Consequently, the Court does not find Defendant Martinez's plan failed to consider "a method for subduing the dogs besides killing them[.]" *Hells Angels*, 402 F.3d at 978. Likewise, the Court does not find that Defendant Martinez's plan "provid[ed the entry team with no] non-lethal means for controlling the dogs." *Id.* at 977. Thus, two of the three components of *Hells Angels* dog management planning are satisfied.

With this in mind, the Court turns to the question whether, under the Modified Dog Management Plan, it was realistic that dogs present at Plaintiffs' Residence would not be shot or killed. The Court concludes the answer here is plainly "yes." Everyone knows *now* that Krizzy

26

died during the episode in question. That is not the question under the Fourth Amendment. The question is was the plan realistic before it was executed. The Court determines that it was. The word "realistic" as used in *Hells Angels* is not drawn from a case. Accordingly, the Court understands it to be used in the ordinary sense. Merriam-Webster gives the pertinent definition of the adjective "realistic" as follows: "based on what is real rather than on what is wanted or hoped for: not impractical or visionary." Merriam–Webster, http://www.merriamwebster.com/dictionary/realistic (last visited August 14, 2018) (giving as an example "a *realistic* plan") (emphasis retained).

The Court finds it realistic that the first two officers in the Stack (including Defendant Martinez) would make it into Plaintiffs' Residence with sufficient time for Defendant Martinez to deploy one of his non-lethal options before either is set upon by a dog.[17] If that is true — and the Court finds that it is — it does not matter that the first person in the Stack was not charged with dog control and may not have non-lethal options readily available to him.[18] Just because it is *realistic* that two officers might enter into a home without being set upon by a dog does not somehow require these two officers to assume they will not be instantaneously set upon by its owner. Simply put, nothing in *Hells Angels* mandates that police officers develop a plan that prioritizes the lives and safety of dogs over their own. While the Court finds this true as a general matter, here, a magistrate has concluded that there was probable cause that methamphetamine would be found in Plaintiffs' Residence — a finding not challenged in this case. Of course, the Ninth Circuit has "made clear that generalized fears about how drug dealers usually act or the weapons that they usually keep is not enough to establish exigency" sufficient to dispense with the knock-and-announce requirement. *United States v. Granville*, 222 F.3d 1214, 1219 (9th Cir. 2000). But nothing in these line of cases — or Fourth Amendment jurisprudence generally —

---

[17] It is realistic to believe that two persons could cross a threshold and one of them deploy something like pepper spray from his belt in an incredibly short amount of time — a matter of moments.

[18] Nothing in Plaintiffs' Submissions take a contrary position. Indeed, during redirect examination of Defendant Martinez, Defendant Martinez responded "[t]rue" to the following question from Plaintiffs' counsel: "And now number 1 guy [in the Stack], common sense, logic, and reason would say he's not going to carry a fire extinguisher because he's the point guy; he's the one that's going in first, right?" (ECF No. 122 at 102:11–15.) While not a legal argument or concession, the Court thinks Plaintiffs' counsel's statement to be eminently reasonable.

mandates officers executing drug warrants have a realistic view of dog management options accompanied by a Pollyannaish attitude about the rest of the world or, more particularly, what awaits them on the other side of door into a home where there is probable cause to believe methamphetamine will be found. *See, e.g.*, *Mendez*, 137 S.Ct. at 1546 ("[R]easonableness is always the touchstone of Fourth Amendment analysis[.]"). It is no less true where officers who are executing a search warrant for methamphetamine also happen to have information that a person who lives in the home to be searched is listed as a suspect in an assault with a deadly weapon, reputed to be hostile to police, and may have a weapon.[19]

The Court's determination that Defendant Martinez's plan is realistic is also not changed by the facts that: (i) Defendant Martinez did not announce the change of plans to the entire Stack, (ii) Defendant Martinez opted for non-lethal means besides a fire extinguisher, or (iii) the plan called for the use of the flash-bang. There is nothing in *Hells Angels* that suggests a team-wide announcement must be made. As stated earlier, the Court finds the question, under *Hells Angels*, is whether the person tasked with dog management devised a plan giving him a realistic opportunity to control the dogs without shooting or killing them, viewed *ex ante*. The Court concludes that the answer in this case is "yes" for the reasons already stated in the preceding paragraph. Likewise, there is nothing in *Hells Angels* that mandates the use of a fire extinguisher or suggests that the non-lethal options Defendant Martinez had on his person were unrealistic options. Indeed, quite to the contrary, *Hells Angels* strongly implies that non-lethal options like a taser or pepper spray are precisely what the Ninth Circuit envisioned as appropriate. *See Hells Angels*, 402 F.3d at 969 & n.8. Finally, the Court doubts there is a right answer about how dogs as a species will react to a loud bang in the backyard. As it happens, within 20 seconds after the loud sound was made, Krizzy set upon a person who entered Plaintiffs' Residence without

---

[19] To be clear, the Court intentionally has not made a finding that this information was sufficient to excuse making a no-knock entry into Plaintiffs' Residence in this case as it is unnecessary to resolve Plaintiffs' first theory of liability. Further, the Court is cognizant of Plaintiffs' suggestion that the CI is a convicted felon who is not cooperating with the authorities out of a sense of civic duty. However, the Court's observation does not turn on the CI's reliability. The Court is simply making the point that it is not objectively unreasonable in the totality of the circumstances for officers to plan for the eventuality that all occupants in Plaintiffs' Residence may not have welcomed their unexpected visit with open arms. No doubt the Stack would have wanted and hoped for such a welcome, but planning based on such wants and hopes is by definition the opposite of a realistic plan.

knocking before that person could get through the door. Is it realistic that a dog might behave otherwise? Certainly, the answer is "yes." Some dogs might continue on as if nothing happened, others might go towards the sound, others might find a preferred hiding place, still others may remain by their master's side, etc. Suffice it to say, the Court is not persuaded that what did happen was the only thing that could realistically have happened.

Lastly, the Court would note that all of the foregoing analysis has put to the side that the Court has found an exigent circumstance developed after the plan was made and in the progress of being executed. Nothing in *Hells Angels* suggests that a realistic plan can never go awry and that officers *who have developed a realistic dog management plan* are barred from making decisions in the heat of the moment to respond to exigencies.[20] Moreover, the Court has already explained that the Fourth Amendment is not violated "based merely on bad tactics that result in a deadly confrontation that could have been avoided," *Sheehan*, 135 S. Ct. at 1777, and that the Fourth Amendment allows officers to react to exigencies created by tactical missteps, *King*, 563 U.S. at 462.

Consequently, for the reasons set forth above, the Court concludes that the Modified Dog Management Plan was consistent with the teachings of *Hells Angels*. Accordingly, neither of the Remaining Individual Defendants may be held liable under this theory of liability.

e. Ultimate conclusion for the First Cause of Action

For the reasons set forth above, the Court makes the following ultimate conclusions with respect to Plaintiffs' First Cause of Action:

1. As to the first theory of liability, Defendant Hale is not liable because the Court finds he did not integrally participate in a knock-and-announce violation.

2. As to the first theory of liability, Defendant Martinez is not liable because the Court finds he had a reasonable suspicion that a knock-and-announce entry would be futile.

---

[20] *Hells Angels* suggests that officers *who have not developed a realistic plan* may have a hard time convincing a factfinder that an exigency has arisen. *See Hells Angels*, 402 F.3d at 978. In doing so, the Ninth Circuit spoke without the benefit of cases like *King*, *Sheehan*, or *Mendez*. Consequently, a serious question might be raised, in the appropriate case, regarding whether the little the Ninth Circuit offered on exigencies in *Hells Angels* comports with current Fourth Amendment jurisprudence. However, as these statements in *Hells Angels* presupposed the existence of an inadequate dog management plan, there is no need to analyze the subject further.

3. As to the second theory of liability, Plaintiffs' theory is incoherent and fails to explain how the Court could find Defendants Hale and Martinez liable in the event the Court found the Remaining Individual Defendants were not liable under Plaintiffs' first theory. Accordingly, the Court finds that Plaintiffs have failed to meet their burden to show their entitlement to relief under their second theory of liability, irrespective of whether Defendant Martinez's Modified Dog Management Plan satisfies *Hells Angels*.

4. In any event, as to the second theory, the Court separately concludes that neither Defendant Hale nor Defendant Martinez are liable under the second theory of liability as the Modified Dog Management Plan is sufficient under *Hells Angels*.

5. In sum, judgment will be entered in favor of Defendants Martinez and Hale on the First Cause of Action, as the Court finds Plaintiffs have failed to show that either Defendant Hale or Defendant Martinez are liable under the First Cause of Action under either of the theories Plaintiffs have advanced.

### ii. The Third Cause of Action

Plaintiffs' Third Cause of Action is a Fourth Amendment claim seeking to impose liability on the City for the shooting death of Krizzy under *Monell*. Before proceeding, the Court will first briefly give an overview of *Monell* liability, which the Court will cross-reference in connection with Part II of this opinion relating to the seizure of the Items.

### a. General principles of *Monell* liability

42 U.S.C. § 1983 provides in pertinent part:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

In *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), the Supreme Court held that "[l]ocal government entities are considered 'persons' for purposes of § 1983[.]" *Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006). Consequently, "[a] municipality or other local government may be liable under this section if the governmental body

30

itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). However, in *Monell*, the Supreme Court also "made clear that the municipality itself must cause the constitutional deprivation and that a city may not be held vicariously liable for the unconstitutional acts of its employees under the theory of *respondeat superior*." *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). That is, "under § 1983, local governments are responsible only for 'their *own* illegal acts.'" *Connick*, 563 U.S. at 60 (emphasis retained) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)).

Accordingly, under *Monell*, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Id.*; *see also Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1075 (9th Cir. 2016) (en banc) ("The first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.") (internal quotation marks omitted). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61. "These are 'action[s] for which the municipality is actually responsible.'" *Id.* (quoting *Pembaur*, 475 U.S. at 479–480).

In sum, a plaintiff may establish municipal liability under section 1983 in the following three ways:

> First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity. Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy. Whether a particular official has final policy-making authority is a question of state law. Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

*Gillette*, 979 F.2d at 1346–47 (citations and internal quotation marks omitted).

31

b.  <u>Reasoning</u>

The Court will now turn briefly to Plaintiffs' theories of liability for their Third Cause of Action.  In Plaintiffs' Proposed Findings, Plaintiffs seem to be advancing two (semi-discreet) theories of liability.  However, there is simply no need to discuss them in detail or determine the full extent of the overlap between these theories.  Simply put, it is pellucidly clear that each theory turns on the Court concluding that Defendant Martinez did not develop a *Hell Angels*-compliant dog management plan.  (*See* ECF No. 134 at 44–45.)  The Court has already concluded the Modified Dog Management Plan satisfies *Hells Angels*.  Plaintiffs' theories of liability fail for this reason.

c.  <u>Ultimate Conclusion for the Third Cause of Action</u>

For the reasons set forth above, the Court makes the following ultimate conclusions with respect to Plaintiffs' Third Cause of Action:

1.  As to both of Plaintiffs' theories of liability with respect to the Third Cause of Action, the Court concludes that the City is not liable because the Court has already concluded the Modified Dog Management Plan was sufficient under *Hells Angels*.

2.  Accordingly, judgment will be entered in favor of the City on the Third Cause of Action, as the Court finds Plaintiffs have failed to show that the City is liable under the Third Cause of Action under either of the theories Plaintiffs have advanced.

**III.  PART II: THE ITEMS**

A.  <u>Plaintiffs' Theory</u>

As stated at the outset, the second part of this action deals with the Items seized from Plaintiffs' Residence on March 24, 2011.  Plaintiffs' First Amended Complaint contains a single cause of action relating to the Items — the Second Cause of Action.  ("the FAC", ECF No. 22.)  The Second Cause of Action is a Fourth Amendment *Monell* claim brought against the City.  (ECF No. 22 at 6–7.)  The FAC contained the following factual allegations:

> Defendant CITY has a policy that they will not release property seized unless the person arrested with the property can *prove* that it is lawfully their property.  This policy is formal.  The policy puts the burden of proof on the citizen to prove ownership, as opposed to Defendant CITY proving non-ownership by the citizen.

(ECF No. 22 at ¶ 34 (emphasis retained).)  Furthermore, the FAC asserted that the City's "policy that they will not release property seized, unless the person arrested with the property can prove that it is lawfully their property" caused a Fourth Amendment violation — the non-return of the Items by the City, despite Plaintiff Potter never being criminally charged in connection with the Items.  (ECF No. 22 at ¶ 56.)

So what does the Fourth Amendment have to say about this policy?  Both Plaintiffs' trial brief and Plaintiffs' Proposed Findings contain the following language:

> The law states that when property in question is no longer needed for evidentiary purposes, either because a trial is complete, the defendant has pleaded guilty, or, as here, the government has abandoned its investigation, the burden of proof changes; the person from whom the property is seized is presumed to have a right to its return, and the government has the burden of demonstrating that it has a legitimate reason to retain the property.  *Ferris v. United States*, 511 F. Supp. 795, 796 (D.Nev.1981); *Mr. Lucky Messenger Service v. US*, 587 F.2d 15[,] 17 (1978) (where government has held property for 18 months without filing criminal charges, equity mandates return of property unless government can justify its actions).  In such a case, the legality of the search and seizure is no longer an issue; even if the seizure was lawful the government must justify its continued possession of the property by demonstrating that it is contraband or subject to forfeiture.  *Sovereign News Co. v. United States*, 690 F.2d 569, 577 (6th Cir.1982), cert. denied, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *United States v. Smith*, 659 F.2d 97, 99 (8th Cir.1981).

(ECF Nos. 134 at 38; ECF No. 102 at 18–19.)

## B.  Defendants' Position

Defendants' position is rather straightforward: the sole issue tried with respect to the Items was whether "[t]he City of Red Bluff's policy regarding release of the property applicable to this case" caused the destruction or non-return of the Items seized from Plaintiffs' Residence.  (ECF No. 133 at 9–10.)  In Defendants' view, "Plaintiffs failed to show that this policy is unconstitutional on its face," and have not otherwise shown the existence of a practice or custom relating to return (or non-return) of property held by the City that caused the destruction or non-return of the Items.  (ECF No. 133 at 10.)  Moreover, even assuming the City had a custom or policy regarding non-return or destruction of seized items that was problematic in the abstract, Defendants' argue Plaintiffs have not shown they actually sought to prove their ownership, let

alone that they were "denied return of the items due to a refusal on the part of the police department." (ECF No. 133 at 11.)

C. Preliminary Discussion and Reasoning

It proves unnecessary for the Court to make primary (or evidentiary) factual findings as the Court did in connection with the shooting of Krizzy for two reasons which, together, require judgment be entered against Plaintiffs on their Second Cause of Action. First, having reviewed the authorities pin-cited by Plaintiffs, it is immediately obvious that "the law" that is being discussed in the relevant portions of those cases *is not the Fourth Amendment*. Second, there is no other theory of liability or cause of action relating to the Items properly before the Court besides the one described in Section III.A. of this opinion. The Court will discuss these reasons in order.

1. *Plaintiffs are not relying on the Fourth Amendment*

Plaintiffs contend the government has abandoned its investigation into the Items without bringing charges against Plaintiff Potter relating to the Items. This is not in dispute. Further, Plaintiffs argue that in this circumstance, "[t]he law states . . . the person from whom the property is seized is presumed to have a right to its return, and the government has the burden of demonstrating that it has a legitimate reason to retain the property." (ECF No. 134 at 38; ECF No. 102 at 18–19.) Moreover, Plaintiffs state that at this stage, irrespective of the legality of the search and seizure, "the government must justify its continued possession of the property by demonstrating that it is contraband or subject to forfeiture." (ECF No. 134 at 38; ECF No. 102 at 18–19.)

Although the four cases pin-cited by Plaintiffs make such statements, there is, nevertheless, a fundamental problem with Plaintiffs' argument: "the law" being discussed in the pin-citations is *not the Fourth Amendment*. None of the pin-citations mention the Fourth Amendment. Indeed, the Fourth Amendment is never mentioned at all in three of the four cases. Rather, as the Court will explain, "the law" at issue is the law governing motions to return under Rule 41(g) of the Federal Rules of Criminal Procedure and an analogous equitable cause of action under the equitable or supervisory power of federal district courts over searches and seizures that

34

are "federal" in nature.

A leading treatise explained as follows:

> Rule 41(g) allows persons to move the government to return property. From its original adoption in 1944 until 2002, Rule 41 covered motions to return property under subdivision (e). In 2002, the motion-to-return provision was re-designated Rule 41(g). Courts recognize that case law interpreting former Rule 41(e) generally applies to current Rule 41(g).

3A Charles A. Wright et al., *Federal Practice and Procedure* § 690 (4th ed. 2010). This is, of course, true in the Ninth Circuit. For example, *United States v. Martinson*, 809 F.2d 1364, 1369–70 (9th Cir. 1987), contains precisely the language that Plaintiffs quote as "the law" citing the same four cases (among others). Moreover, *Martinson* explained that "[a] district court has jurisdiction to entertain motions to return property seized by the government when there are no criminal proceedings pending against the movant." *Martinson*, 809 F.2d at 1366–67. However, "[s]uch motions are treated as civil equitable proceedings even if styled as being pursuant to" Rule 41. *Id.* at 1367.

Plaintiffs cannot obtain relief under their Fourth Amendment *Monell* claim arguing the City has not complied with law *other than the Fourth Amendment*. As noted earlier, it is a bedrock principle of civil litigation in federal courts that plaintiffs must show legal entitlement to the relief they request, unless Congress otherwise specifies. *See Schaffer*, 546 U.S. at 56–58. Congress has not displaced this default rule for claims brought pursuant to § 1983. *See Pavao*, 307 F.3d at 919. Consequently, Plaintiffs' failure to show their theory is a *Fourth Amendment* theory is a fatal flaw.

However, the problem with Plaintiffs' theory does not end there. Rule 41 motions to return, and their equitable analogs, are not available to every person who wants his alleged property returned irrespective of the circumstances of this search for and seizure of that property. Rather, the Ninth Circuit has made clear relief under the line of cases is only available for "federal searches leading to federal prosecutions and extends in its furthest reach to searches conducted by state law enforcement agencies with direct federal authorization." *United States v. Huffhines*, 986 F.2d 306, 308 (9th Cir. 1993). Plaintiffs have neither introduced evidence nor

35

made an argument that there was *any federal involvement* in the search for or seizure of the Items.[21] Consequently, unless there is another theory of liability properly before the Court relating to the Items, judgment cannot be entered in favor of Plaintiffs on a claim relating to the Items.

### 2. No other theories are properly before the Court

As alluded to earlier, Plaintiffs' Submissions are not a model of clarity. It brings the Court no pleasure in pointing out these deficiencies. Indeed, the Court has gone out of its way to not discuss them unless it is material. However, there are prudential limits to shielding the feelings of attorneys. Unfortunately, they are reached here. It is clear the FAC's Second Cause of Action is a *Monell* claim that only names the City as a defendant. Equally clear, the FAC's Second Cause of Action challenges a specific city policy as it relates to the non-return or destruction of Items. For the Court to reach another theory of liability relating to the Items, Plaintiffs would have to amend the operative complaint under Rule 15 of the Federal Rules of Civil Procedure. Rule 15(a) allows an amendment prior to trial. This simply was not done. Similarly, a party may move to amend the pleading pursuant to Rule 15(b). However, this too "requires that one of the parties request an amendment." *Crawford v. Gould*, 56 F.3d 1162, 1169 (9th Cir. 1995). No such request has been made.

Nor is this a case where "an issue not raised by the pleadings is tried by the parties' express or implied consent[.]" Fed. R. Civ. P. 15(b)(2). This is abundantly clear from the parties' arguments in connection to Defendants' oral Rule 52(c) motion. Defense counsel's argument with respect to the Items clearly was addressing a Fourth Amendment *Monell* claim that challenged the non-return or destruction of the Items pursuant to policy. (*See* ECF No. 124 at 23:9–24:24.) Plaintiffs' counsel's somewhat meandering oral opposition with respect to the Items took more than eight pages of the trial transcript. (ECF No. 124 at 36:1–44:5.) However, having carefully re-reviewed this portion of the transcript, Plaintiffs' counsel seems to believe himself to be defending the theory of liability the Court has rejected rather than expounding on a new one.

---

[21] This is not to say there is nothing approximating motions to return under Rule 41(g) or their equitable analogs under California law. *Cf. Lawrence v. Superior Court*, 21 Cal. App. 5th 513 (2018). However, the Court thinks its imprudent, if not improper, to say more on this topic in this case. *See Greenlaw*, 554 U.S. at 243–44.

It is true that Plaintiffs' counsel's opposition digresses into statements about whether Defendant Hale had probable cause to seize the Items in the first place. However, Plaintiffs' counsel seems to be attempting to parry an argument he believes Defense counsel has made, as this digression begins with the following sentence: "So let's talk about that because that's part of their motion here that they had probable cause to seize the items."[22] (*See* ECF No. 124 at 38:20–21.) Moreover, the following quotation demonstrates that Plaintiffs' counsel ties his probable cause arguments to the theory the Court has rejected as not being a Fourth Amendment theory at all:

> So why is the city responsible for that, that conduct of what happened with the property? Here is the problem with the city's policy . . . . That the city policy is when we seize property, the person we seized it from has to prove ownership when they get it -- to get it back. Whether it's -- he says, whether it's evidence or it's safekeeping, they've got to prove ownership to get it back.

(ECF No. 124 at 41:20–42:3.)

In any event, Defense counsel's oral reply left nothing to chance:

> Plaintiff went to great lengths to argue whether or not there was probable cause, whether officer Hale had reason to seize his property. Again, there's no *respondeat superior* liability with the City of Red Bluff. This is a 4th Amendment *Monell* claim. Again, the policy has to be the moving force behind the deprivation. The only policy that plaintiffs' case has pointed to is safekeeping versus evidence of the different categories of booking. There's no evidence that there was a pattern of not returning property that was taken and booked as evidence versus safekeeping. There was no -- no other incident no testimony that this happened to a bunch of people, absolutely none, very insufficient under a *Monell* claim.

> And as to whether or not there was probable cause to take the property, that's not at issue. There's no claim against Hale for the taking of the property under the 4th Amendment. It's a *Monell* claim against the city. That's what has been litigated and alleged and has not been shown. So with that I submit.

(ECF No. 124 at 47:1–19.)

Accordingly, the only theory of liability before the Court relating the Items is the one the

---

[22] Frankly, the Court does not understand Defense counsel to have made such an argument in connection with the Rule 52(c) motion. Indeed, the words "probable cause" do not appear in her opening argument. Rather, it seems Plaintiffs' counsel may have misunderstood Defense counsel's suggestion that Plaintiffs could not maintain a Fourth Amendment claim with respect to the destruction or non-return of the Items if the Court concluded that Plaintiffs were not the true owners of Items. (*See* ECF No. 124 at 24:9–24.)

Court has rejected as not being a Fourth Amendment theory at all. Consequently, the Court cannot impose liability on Defendant Hale for allegedly seizing the Items without probable cause as Plaintiffs' suggest. Certainly, the Court cannot impose liability on the City for Hale allegedly seizing the Items without probable cause. To do either would violate "the well-established rule that a court may not, without the consent of all persons affected, enter a judgment which goes beyond the claim asserted in the pleadings." *Crawford*, 56 F.3d at 1168 (internal quotation marks and alterations omitted).

### D. Ultimate Conclusion for the Second Cause of Action

For the reasons set forth above, the Court makes the following ultimate conclusions with respect to Plaintiffs' Second Cause of Action:

1. The Second Cause of Action is a Fourth Amendment *Monell* claim against the City. Only one theory of liability is properly before the Court. That theory is not a Fourth Amendment theory.

2. Accordingly, judgment will be entered in favor of the City on the Second Cause of Action, as the Court finds Plaintiffs have failed to show that the City is liable under the Second Cause of Action.

### IV. CONCLUSION

For the foregoing reasons, the Court enters judgment as follows:

1. Judgment is entered against Plaintiffs on the First Cause of Action;

2. Judgment is entered against Plaintiffs on the Second Cause of Action;

3. Judgment is entered against Plaintiffs on the Third Cause of Action; and

4. The Clerk of Court shall close the case.

IT IS SO ORDERED.

Dated: August 28, 2018

Troy L. Nunley
United States District Judge